# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE McDONALD'S CORPORATION ) 
STOCKHOLDER DERIVATIVE ) C.A. No. 2021-0324-JTL 
LITIGATION )

## OPINION

Date Submitted: December 15, 2022
Date Decided: January 25, 2023

Michael J. Barry, Christine M. Mackintosh, Rebecca A. Musarra, Vivek Upadhya, Michael D. Bell, GRANT & EISENHOFFER P.A., Wilmington, Delaware; Barbara J. Hart, GRANT & EISENHOFFER P.A., New York, New York; Geoffrey M. Johnson, SCOTT+SCOTT ATTORNEYS AT LAW LLP, Cleveland Heights, Ohio; Jing-Li Yu, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; Max R. Huffman, SCOTT+SCOTT ATTORNEYS AT LAW LLP, San Diego, California; Jeffrey M. Norton, Benjamin D. Baker, NEWMAN FERRARA LLP, New York, New York; *Attorneys for Plaintiffs Teamsters Local 237 Additional Security Fund, Teamsters Local 237 Supplemental Fund for Housing Authority Employees, Teamsters Local 237 Welfare Fund, and Phyllis Gianotti.*

Garrett B. Moritz, S. Reiko Rogozen, Holly E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Ronald L. Olson, George M. Garvey, Robert L. Dell Angelo, Brian R. Boessenecker, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Defendants Enrique Hernandez, Jr., Lloyd H. Dean, Robert A. Eckert, Margaret H. Georgiadis, Richard H. Lenny, John J. Mulligan, Sheila A. Penrose, John W. Rogers, Jr., and Miles D. White, and McDonald's Corporation.*

Daniel C. Herr, LAW OFFICES OF DANIEL C. HERR LLC, Wilmington, Delaware; Shawn P. Naunton, Catherine S. Duval, Leila Bijan, ZUCKERMAN SPAEDER LLP, New York, New York; *Attorneys for Defendant Stephen J. Easterbrook.*

Kathleen M. Miller, Julie M. O'Dell, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Attorneys for Defendant David Fairhurst.*

**LASTER, V.C.**

Defendant David Fairhurst served as Executive Vice President and Global Chief People Officer of McDonald's Corporation ("McDonald's" or the "Company") from 2015 until his termination with cause in 2019. In that position, Fairhurst was the executive officer with day-to-day responsibility for ensuring that one of the largest employers in the world provided its employees with a safe and respectful workplace.

In this action, stockholders of the Company have sued Fairhurst derivatively on the Company's behalf. They allege that during Fairhurst's tenure as the head of human resources, he breached his fiduciary duties by allowing a corporate culture to develop that condoned sexual harassment and misconduct. They assert that Fairhurst's fiduciary duties included a duty of oversight, which required that he make a good faith effort to establish an information system that would generate the information necessary to manage the Company's human resources function. They maintain that Fairhurst had a duty to use the resulting information to do his job and to report on his areas of responsibility to the CEO and the board. Those duties, they say, demanded that he address or report upward about any red flags regarding sexual harassment and misconduct at the Company.

The plaintiffs do not allege that Fairhurst failed to make a good faith effort to establish information systems. They argue instead that Fairhurst breached his duty of oversight by consciously ignoring red flags.

Fairhurst has moved to dismiss the oversight claim under Rule 12(b)(6) for failing to state a claim on which relief can be granted. Fairhurst contends that Delaware law does not impose on officers any obligations comparable to the duty of oversight articulated by

Chancellor Allen in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996).

This decision clarifies that corporate officers owe a duty of oversight. The same policies that motivated Chancellor Allen to recognize the duty of oversight for directors apply equally, if not to a greater degree, to officers. The Delaware Supreme Court has held that under Delaware law, corporate officers owe the same fiduciary duties as corporate directors, which logically includes a duty of oversight. Academic authorities and federal decisions have concluded that officers have a duty of oversight.

The fact that corporate directors owe a duty of oversight does not foreclose officers from owing a similar duty. Just as a junior manager with supervisory duties can report to a senior manager with supervisory duties, so too can an officer with a duty of oversight report to a board of directors with a duty of oversight. And just as a senior manager with supervisory duties can hold a junior manager accountable for failing to fulfill the junior manager's supervisory duties, so too can a board with a duty of oversight hold an officer accountable for failing to fulfill the officer-level duty.

Although the duty of oversight applies equally to officers, its context-driven application will differ. Some officers, like the CEO, have a company-wide remit. Other officers have particular areas of responsibility, and the officer's duty to make a good faith effort to establish an information system only applies within that area. An officer's duty to address and report upward about red flags also generally applies within the officer's area, although a particularly egregious red flag might require an officer to say something even if it fell outside the officer's domain. As with the director's duty of oversight, establishing

2

a breach of the officer's duty of oversight requires pleading and later proving disloyal conduct that takes the form of bad faith.

Fairhurst thus owed a duty of oversight. He had an obligation to make a good faith effort to put in place reasonable information systems so that he obtained the information necessary to do his job and report to the CEO and the board, and he could not consciously ignore red flags indicating that the corporation was going to suffer harm.

Fairhurst next argues that even if he owed a duty of oversight, the plaintiffs have failed to allege sufficient facts to state a claim against him. The plaintiffs have identified red flags indicating that sexual harassment occurred at the Company. They also have alleged facts supporting a reasonable inference that Fairhurst knew about the red flags. The analysis comes down to whether Fairhurst acted in bad faith by consciously ignoring the red flags.

Delaware law presumes that directors and officers act in good faith, and a complaint must plead facts sufficient to support an inference of bad faith intent. The complaint alleges that in December 2016 and again in November 2018, Fairhurst engaged in acts of sexual harassment. He was also warned about his use of alcohol at Company events. Fairhurst was disciplined for the November 2018 incident, then terminated in November 2019 after he committed another act of sexual harassment. The complaint cites statements from Company employees who asserted that under Fairhurst's watch, the human resources function turned a blind eye to complaints about sexual harassment. During 2018, the Company faced a series of public issues relating to sexual harassment, including coordinated complaints filed by restaurant workers and a ten-city strike.

When a corporate officer himself engages in acts of sexual harassment, it is reasonable to infer that the officer consciously ignored red flags about similar behavior by others. As Global Chief People Officer, Fairhurst was obligated to know about what was going on with the Company's employees, and he had day-to-day responsibility for the department charged with promoting a safe and respectful workplace. It is reasonable to infer that Fairhurst knew about and played a role in creating the Company's problems with sexual harassment and misconduct, which led to the external signs that took the form of employee complaints and a ten-city strike. The plaintiffs have therefore stated a claim against Fairhurst for breach of his oversight duties.

The more difficult question is whether the plaintiffs have stated a claim based on events that post-dated November 2018, when Fairhurst was disciplined for his second incident of sexual harassment. A series of events in 2018, including the incident with Fairhurst, caused the Company's management team and its directors to begin focusing on issues of sexual harassment and misconduct at the Company. There is record evidence that Fairhurst was part of the management team's response. In addition, the human resources function necessarily would have been part of the responsive steps that the management team took.

It is possible that Fairhurst's actions in 2019 could mean that the claim against him cannot extend beyond November 2018, when he was disciplined and seemingly joined in trying to fix the problem that he had helped create. Of course, one year later, he was terminated for another incident of sexual harassment, which supports an inference that either the message did not get through or that it was consciously ignored. Given the

4

complaint's allegations, it is not possible to determine at this stage when to cut off Fairhurst's exposure. The plaintiffs have pled a claim against Fairhurst, and that is sufficient to survive Fairhurst's motion to dismiss.

The plaintiffs also allege that Fairhurst's acts of sexual harassment constituted a breach of duty in themselves. The duty of good faith requires that a fiduciary subjectively act in the best interests of the entity. When engaging in sexual harassment, the harasser engages in reprehensible conduct for selfish reasons. By doing so, the fiduciary acts in bad faith and breaches the duty of loyalty. The plaintiffs' claim against Fairhurst for his own acts of sexual harassment states a claim on which relief can be granted.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference.[1] At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences. Because this decision concerns the claims against Fairhurst, it emphasizes the facts relevant to him.

### A. The Company

The Company is a Delaware corporation with its principal place of business in Chicago, Illinois. When this litigation began, there were more than 36,000 McDonald's-

---

[1] Citations in the form "Compl. ¶ —" refer to allegations in the plaintiffs' amended and consolidated complaint. Citations in the form "Ex. — at —" refer to exhibits to the Transmittal Declaration of S. Reiko Rogozen, which the director defendants filed in support of their motion to dismiss and upon which Fairhurst relied. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

branded restaurants in over 100 countries. The Company both operates corporate-owned restaurants and acts as a franchisor. In the year immediately preceding this litigation, the Company earned approximately $19 billion in revenue. Corporate-owned restaurants accounted for $8 billion while franchised restaurants produced $11 billion.

The Company has over 200,000 employees, and franchises employ another two million, making the Company one of the world's largest employers. Over half (55%) of all Company and franchisee employees are women. At more senior levels, the percentage of women decreases, and just over one-fourth (27%) of the Company's officers are female.

Young people in entry-level positions make up a large portion of the Company's workforce, and the Company prides itself on being "America's best first job." Compl. ¶ 26. The Company's Standards of Business Conduct and its Human Rights Policy call for cultivating "respectful workplaces" and creating a professional environment that "builds trust, protects the integrity of our brand and fuels our success." *Id.* ¶ 28.

**B.      Fairhurst Becomes The Company's Global Chief People Officer.**

In 2015, the Company faced its first sales decline in twelve years. To turn the Company around, the board of directors (the "Board") hired Stephen J. Easterbrook as CEO. Easterbrook was a longtime Company employee who served in various positions from 1993 until 2011, including as Senior Vice President for the United Kingdom and Northern Europe. After a brief hiatus, Easterbrook returned to the Company in 2013 as Executive Vice President and Chief Brand Officer.

In March 2015, Easterbrook formally became CEO and started working out of the Company's headquarters in Chicago, Illinois. Easterbrook promptly promoted Fairhurst to

6

the position of Global Chief People Officer. Fairhurst, another longtime Company employee, previously served as the Company's Vice President and Chief People Officer for Europe. He and Easterbrook became close personal friends while working together in the Company's London office. Fairhurst joined Easterbrook at the Company's Chicago headquarters.

## C.    A Party Atmosphere

Easterbrook and Fairhurst promoted and participated in a "party atmosphere" at the Chicago headquarters. Compl. ¶ 49. The eighth floor of the Chicago office had an open bar where executives hosted weekly happy hours. Easterbrook and Fairhurst frequently attended with their management teams. "Male employees (including senior corporate executives) engaged in inappropriate behavior at these happy hour events, routinely making female employees feel uncomfortable." *Id.* ¶ 6; *see id.* ¶ 50.

Employees also frequently drank alcohol at other Company-affiliated events. Easterbrook, Fairhurst, and other Company executives, including the Senior Vice President of Human Resources, participated in drinking excursions. Easterbrook and Fairhurst developed reputations for flirting with female employees, including their executive assistants.

The Company grew to resemble a boys' club. Recruiters were encouraged to hire "young, pretty females" from high-end stores to work in administrative roles at the Chicago headquarters. *Id.* ¶ 51. Easterbrook became known as a "player" who pursued intimate relationships with staff. *Id.*

7

As the culture changed, the human resources function that Fairhurst oversaw failed to address complaints adequately. Former Company managers reported that "HR leaders under Mr. Easterbrook ignored complaints about the conduct of co-workers and executives. Some of those people said they feared retaliation for reporting the conduct of co-workers and executives to HR." *Id.* ¶ 52. Two former executives reported that "the environment in HR during Fairhurst's tenure made employees feel as if they had little recourse for reporting bad behavior." *Id.* ¶ 59.

**D.      The Company Faces Public Scrutiny Over Sexual Harassment.**

During the year after Easterbrook and Fairhurst took over, the Company began to face increasing public scrutiny about problems with sexual harassment and misconduct. In October 2016, more than a dozen Company workers from restaurants across the nation filed complaints with the Equal Employment Opportunity Commission ("EEOC") that contained disturbing allegations about sexual harassment and retaliation. Later that month, a fast-food worker advocacy group organized a walkout by Company employees in over thirty cities across the United States to draw attention to the EEOC complaints. Major news outlets covered these events.

In May 2018, the Company faced another round of EEOC complaints, this time identifying both individual instances of misconduct and broader systemic issues throughout the Company. Company employees claimed that the human resources function turned a blind eye to harassment.

In September 2018, Company workers from ten cities across the United States organized a one-day strike to protest sexual harassment and the failure of Company

8

management to address it. The protest attracted the attention of lawmakers, and in December 2018, United States Senator Tammy Duckworth sent an inquiry to Easterbrook about "multiple sexual harassment complaints made by employees who work at McDonald's Restaurants in Detroit, Chicago, Los Angeles, and six other cities." Compl. ¶ 113.

**E.    Reports Of Misconduct By Fairhurst**

During the same month that Senator Duckworth sent her inquiry, the Board received reports that Fairhurst himself had committed acts of sexual harassment. During a Company party in November 2018 for the human resources staff, Fairhurst pulled a female employee onto his lap. Over thirty Company employees witnessed the incident, and several reported it to the Company's Compliance Department. The Compliance Department evaluated the reports and "concluded that David Fairhurst behaved and put himself in a position inconsistent with the Company's Standards of Business Conduct." Compl. ¶ 54.

On December 13, 2018, the Board's Audit & Finance Committee (the "Audit Committee") discussed Fairhurst's misconduct. Easterbrook advised the Audit Committee that an employee described a prior incident of sexual harassment by Fairhurst in December 2016 that had not been reported to the Compliance Department. Ex. 61 at 1. Easterbrook also reported that Fairhurst had "once before been warned about excessive drinking at Company events in the past." *Id.*

The Company ostensibly had a zero-tolerance policy for acts of sexual harassment. Under the Company's policy, Fairhurst's actions qualified as sexual harassment. Because Fairhurst had grabbed the employee and forced her onto his lap, his actions technically

9

constituted an assault. But Easterbrook recommended a deviation from the zero-tolerance policy. He proposed that Fairhurst's punishment should be "forfeiting 50% of his [target incentive plan] bonus payment for 2018" as well as "signing both an agreement regarding the conduct and a release." Compl. ¶ 61. The Audit Committee approved Easterbrook's proposal. *Id.*

After the Audit Committee meeting, Easterbrook directed the Senior Vice President of Human Resources to inform "all participants in the event that management had appropriately addressed the matter." *Id.* ¶ 62 (formatting added).

To document his arrangement with the Company, Fairhurst executed a "Last Chance" letter. Ex. 62 (the "Last Chance Letter"). The Last Chance Letter confirmed that Fairhurst's behavior was not an isolated incident: "Concerns have been raised to the company in the past and recently about your alcohol consumption at company-sponsored and company-related events, and separately about your personal conduct during some of those events which have made some employees uncomfortable." *Id.* at '423. The Last Chance Letter recited that Fairhurst had "demonstrated inappropriate and disruptive behavior while under the influence of alcohol at a company-related gathering and dinner of U.S. HR staff on November 8, 2018." *Id.*

The Last Chance Letter unambiguously stated that Fairhurst's actions violated the Company's Standards of Business Conduct. It also noted that Fairhurst's misconduct put "the Company at significant risk." *Id.* Despite those findings and concessions, Fairhurst continued to serve as the Company's Global Chief People Officer.

10

**F.     Management And The Board Take Actions To Address The Company's Problems With Sexual Harassment And Misconduct.**

The events of 2018 caused Company management and the Board to engage with the issue of sexual harassment and misconduct. In a memorandum dated January 17, 2019, Jerry Krulewitch, the Company's General Counsel, reported to the Board's Public Policy & Strategy Committee (the "Strategy Committee") about the EEOC complaints and the ten-city strike. Ex. 49. Krulewitch explained that in response to the focus on problems of sexual harassment and misconduct, "McDonald's teams have been proactively working to improve policies and programs related to these issues." *Id.* at 2. In the next sentence, Krulewitch reported that "[w]orking with insurance, we have created financial incentives for the franchisees to take the training, [REDACTED FOR NON-RESPONSIVENESS]."[2] In May 2019, during a meeting of the full Board, Krulewitch reported on the EEOC complaints. Ex. 51 at 8. He noted that "since the charges in 2018, the Company had been working diligently to enhance its programs and policies with regard to sexual harassment with a deliberate focus on the restaurants." *Id.* He then described actions the Company had

---

[2] *Id.* The Company made this partial-sentence redaction, purportedly for non-responsiveness, as part of its production of Section 220 documents. This court has acknowledged that when producing books and records, a company may redact "material unrelated to the subject matter of the demand." *Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *13 (Del. Ch. June 1, 2022). Under that standard, a mid-sentence redaction raises questions. There is no reason to think that the author of the minutes incoherently injected an unrelated topic into an otherwise responsive sentence within a responsive paragraph dealing with the Company's response to concerns about sexual harassment. The outcome of this decision does not hinge on the improper redactions, but that will not always be the case.

taken, including revising its policies, providing training, offering new tools to franchisees, and engaging outside experts. *Id.* at 8–9.

In June 2019, Senator Duckworth and seven other United States Senators signed a joint letter to the Company, directed to Easterbrook, that asked ten specific questions about sexual harassment and other workplace safety issues. Ex. 86. The letter requested a response by June 25. *Id.*

Later that month, Fairhurst joined Krulewitch and Robert Gibbs, the Company's Chief Communications Officer, in authoring a memorandum for the Strategy Committee. Ex. 47 (the "June 2019 Memorandum"). The memorandum noted that at earlier meetings during the year, the directors had discussed "the issue of sexual harassment, as well as the proactive work we are doing to create a safe and respective workplace for our employees and to support the efforts of our independent owner/operators to do the same." *Id.* at 1. The memorandum noted that during a meeting in May 2019, the Strategy Committee had scheduled "a separate meeting to discuss these issues in more detail." *Id.*

The June 2019 Memorandum summarized the situation facing the Company and management's response. Under the heading "*What is occurring?*", the memorandum described the EEOC complaints and the allegations regarding systemic harassment. *Id.* Under the heading *"How is McDonald's responding to the issue of allegations of sexual harassment?*", the memorandum identified steps the Company was taking, including:

- A comprehensive review of the Company's anti-harassment policy.

- The engagement of the Rape, Abuse & Incest National Network ("RAINN") to advise the Company. The memorandum described RAINN as the largest anti-sexual

12

violence organization in the country and a pioneer in education programs about preventing sexual misconduct and harassment.

- A holistic review of the Company's training programs and the retention of Seyfarth Shaw at Work to assist the Company in providing training for both Company employees and franchise restaurant employees about how to establish and maintain a safe and respectful workplace.

- Additional crew, restaurant manager, and franchisee training on harassment, unconscious bias, and workplace safety.

- The establishment of a new, third-party managed hotline for employees at franchise restaurants to report complaints of any kind.

- A shared values commitment to be signed by franchisees that included a mutual understanding and responsibility for ensuring a safe, healthy, and respectful environment.

- A franchisee guide containing best practices and recommendations on establishing and maintaining a safe and respectful workplace.

- A cultural assessment including listening sessions to promote continuous improvement.

- An end to the Company's previous policy requiring mandatory arbitration of harassment and discrimination claims as a condition of employment.

*Id.* at 2–4.

The June 2019 Memorandum was part of the pre-reading materials for a special Strategy Committee meeting devoted to the subject of sexual harassment. During that meeting, Fairhurst provided an overview of the Company's people and gender strategy, including efforts to drive gender balance and improve diversity. Ex. 50 at 2. Krulewitch reported on the litigation against the Company and "the progress the Company had made in its efforts to promote a safe and respectful workplace." *Id.* at 1. At the end of the meeting, the chair of the Strategy Committee "concluded the discussion by confirming that the

13

Company (i) has developed a comprehensive plan around the issues of sexual harassment and safe and respectful workplace environments; (ii) will continue to be proactive; and (iii) will further evaluate how best to execute its strategy and be a leader on this issue."[3]

In September 2019, the Board received an update on the Company's Enterprise Risk Management ("ERM"). The presentation identified a "Respectful Workplace" as a "New Risk Theme" at the "Top Tier 2" level. Ex. 52 at '138. Under the Company's risk management system, a "Tier 1" risk is (i) "[c]ritical to McDonald's mission and values," (ii) "[a]ppropriate for ERM Committee discussion," and (iii) "[m]ay need further discussion around risk appetite." *Id.* at '142. A Tier 2 risk is one that has the "[p]otential for sustained, negative impact to brand, long term financial grown, or strategy position." *Id.* The Top Tier 2 risks are "[m]ore likely to become Tier 1 risks given the circumstances." *Id.*

That same month, during a special meeting of the Strategy Committee, Fairhurst joined Easterbrook, Gibbs, and Krulewitch in reporting to the Committee on a strategy to improve the Company's reputation as an employer. Ex. 55 at '921. A memorandum distributed to the Committee identified management's "ambition to strive for a leadership position by moving beyond compliance in the area of building a respectful and safe

---

[3] *Id.* at 3. The next paragraph of the minutes was redacted for non-responsiveness. That redaction again raises questions. The minutes documented a special meeting of the Strategy Committee to consider the issue of sexual harassment at the Company and what was being done in response. The meeting as a whole was relevant. It is difficult to imagine what unrelated topic the minutes would have addressed.

workplace." *Id.* at 2. Management reported that they had successfully launched enhanced training "on a number of important topics including [REDACTED FOR NON-RESPONSIVENESS], sexual harassment and unconscious bias, as well as launching our Gender Balance & Diversity Program."[4]

## G. Easterbrook Leaves, And The Board Terminates Fairhurst For Cause.

In October 2019, the Board learned that Easterbrook was engaging in a prohibited relationship with an employee. During a telephonic meeting on October 18, the Board ordered outside counsel to investigate Easterbrook's misconduct. At a meeting on October 26, the Board decided to negotiate a separation agreement with Easterbrook. During a meeting on November 1, the Board finalized the separation agreement and terminated Easterbrook without cause.

During the November 1, 2019 meeting, the Board also addressed "employment matters related to Mr. David Fairhurst." Ex. 63 at 6. The minutes from the meeting do not describe the discussion other than reciting that the Company's general counsel updated the Board on "his recent conversations" with Fairhurst. *Id.* The Board terminated Fairhurst for cause. It is reasonable to infer at the pleading stage that Fairhurst engaged in an additional act of sexual harassment that violated the Last Chance Letter.

---

[4] *Id.* at 2. This document provides yet another example of a redaction that raises questions. The four executives prepared a single-topic memorandum that was just over one page long. The Company included five redactions for non-responsiveness, including mid-sentence redactions. Unless the Company's top managers bizarrely injected unrelated content into a short piece, it seems likely that the entire document was responsive and should have been produced without redactions for non-responsiveness.

15

In a press release on November 3, 2019, the Company announced that Easterbrook was leaving the Company. The press release said only that Easterbrook had "violated company policy and demonstrated poor judgment" and described his relationship with an employee subordinate as "consensual." Ex. 65. The press release did not disclose that the Board had fired Fairhurst.

Fairhurst subsequently entered into a separation agreement with the Company, which documented that he would not be entitled to any severance or the payment of a bonus for 2019 under the Company's target incentive plan. Ex. 75 at 1. In the agreement, Fairhurst purported to have tendered his resignation as Executive Vice President and Global Chief People Officer effective as of November 4, 2019. *Id.* at 3.

## H. Employees File Multiple Lawsuits Against The Company.

On November 12, 2019, less than two weeks after Easterbrook left and the Board terminated Fairhurst, Company workers filed a class action lawsuit challenging the Company's systemic problems with sexual harassment (the "*Ries* Action"). The plaintiffs in the *Ries* Action alleged that the Company had a toxic culture and that "sexual harassment is pervasive throughout McDonald's restaurants." Compl. ¶ 118. The *Ries* complaint contained detailed allegations about "routine, severe abuse" at Company restaurants while Fairhurst served as Global Chief People Officer. *Id.*

The *Ries* Action also detailed a lack of sexual harassment training at franchise restaurants. According to the *Ries* plaintiffs, almost two-thirds of restaurant employees worked at locations that did not provide any sexual harassment training. The *Ries* complaint also alleged that many restaurant employees lacked access to any human

16

resources support and that the Company's corporate human resources department under Fairhurst refused to help workers at franchise restaurants.

In April 2020, workers filed another class action, this time on behalf of workers at Company-owned restaurants in Florida, seeking damages for sexual harassment, retaliation, and related misconduct (the "*Fairley* Action"). The plaintiffs received support from Time's Up Legal Defense Fund, an anti-sexual harassment group.

The complaint in the *Fairley* Action contained allegations similar to the *Ries* Action about systemic failures to curb sexual harassment at Company restaurants while Fairhurst served as Global Chief People Officer. According to the *Fairley* Action, "three out of every four female non-managerial McDonald's employees have personally experienced sexual harassment at McDonald's, ranging from unwelcome sexual comments to unwanted touching, groping, or fondling, to rape and assault." *Id.* ¶ 137. The *Fairley* complaint alleged that "over 70% of those who reported sexual harassment they witnessed or experienced faced some form of retaliation, with 42% reporting loss of income as a result." *Id.* The *Fairley* complaint further alleged that the Company's human resources department was completely ineffective at preventing sexual harassment and discouraged employees from lodging complaints. It cited a recent poll, conducted while Fairhurst was Global Chief People Officer, which revealed that employees "at corporate restaurants are even more likely than workers at franchise restaurants to have experienced sexual harassment, with 83% of female non-managerial workers at corporate restaurants reporting having experienced at least one instance of sexual harassment, and 31% reporting having experienced eight or more types of sexual harassment." *Id.* ¶ 139.

A 2019 survey generated similar results. More than 75% of the Company's female workers reported being sexually harassed at work, and more than 71% reported that they suffered negative consequences for reporting harassment.

## I.      This Litigation

After the public allegations about sexual harassment and misconduct at the Company, various stockholders sought books and records to investigate the possibility of corporate wrongdoing related to that topic. One group of plaintiffs filed this action. A group of plaintiffs who had sought books and records intervened, and the action was stayed pending resolution of their efforts to use the tools at hand to conduct an investigation. Once the investigation was complete, the current plaintiffs filed a consolidated complaint that added Fairhurst and Easterbrook as defendants.

Count III of the operative complaint asserts a claim against Fairhurst for breach of fiduciary duty. The complaint alleges that Fairhurst engaged in inappropriate conduct with female employees and exercised inadequate oversight in response to risks of sexual harassment and misconduct at the Company and its franchises. Fairhurst has moved to dismiss Count III on multiple grounds.

## II.      LEGAL ANALYSIS

As one of his grounds for dismissal, Fairhurst contends that Count III fails to state a claim on which relief can be granted. *See* Ch. Ct. R. 12(b)(6). When considering such a motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley*

18

*Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The motion to dismiss will be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

Fairhurst contends that the plaintiffs have only sued him for breach of the duty of oversight. That is not correct. The plaintiffs have sued Fairhurst for breach of the duty of oversight, and they also have sued Fairhurst for breaching his duty of loyalty by engaging personally in acts of sexual harassment. Both theories state claims on which relief can be granted.

## A. An Officer's Duty Of Oversight

Fairhurst seeks to defeat the plaintiffs' claim for breach of the duty of oversight by arguing that Delaware law does not recognize an oversight claim against corporate officers. Although no Delaware decision has stated the proposition in so many words, diverse authorities indicate that officers owe a fiduciary duty of oversight as to matters within their areas of responsibility. Those authorities include the reasoning of the original *Caremark* opinion, the Delaware Supreme Court's holding that the duties of officers are the same as the duties of directors, decisions from other jurisdictions and academic commentary, and the additional duties that officers owe as agents. This decision confirms that officers owe a duty of oversight.

### 1. The Source Of Oversight Duties

Chancellor Allen's landmark opinion in *Caremark* is generally credited with creating the duty of oversight, but the concept originated earlier in the Delaware Supreme Court's decision in *Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del.

19

1963). That decision was understood to establish "the protective 'red flags' rule," under which directors could be liable for failing to take action only if they were aware of red flags indicating wrongdoing and consciously chose not to act. Martin Lipton & Theodore N. Mirvis, *Chancellor Allen and the Director*, 22 Del. J. Corp. L. 927, 939 (1997). In memorable language, the *Allis-Chalmers* court stated that "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." 188 A.2d at 130. Under *Allis-Chalmers*, directors appeared to have an obligation to respond if information reached them, but no duty to set up an information system to learn about issues within the company. A limited duty of oversight arose only if the directors had already learned enough to suspect that there were issues that needed overseeing.

In *Caremark*, Chancellor Allen artfully explained why *Allis-Chalmers*' colorful reference to a system of corporate espionage "could not be generalized into a rule that, absent grounds for suspected law violation, directors had no duty to assure that an information gathering and reporting system exists to provide senior management and the board with material internal operating information, including as regards legal compliance." Lipton & Mirvis, *supra*, at 939. To the contrary, Chancellor Allen explained that the fiduciary mandate included a duty to make a good faith effort to ensure that

> information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

20

*Caremark*, 698 A.2d at 970.

Chancellor Allen also addressed when directors could be held liable for failing to implement a reporting system to facilitate board oversight. In the words of the *Caremark* decision,

> only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors.

*Id.* at 971 (emphasis omitted).

In *Stone v. Ritter*, the Delaware Supreme Court adopted the reasoning of *Caremark* as a standard of liability for director oversight and identified two types of *Caremark* claims. 911 A.2d 362, 370 (Del. 2006). The high court wrote that to survive a motion to dismiss an oversight claim for failure to plead demand futility under Rule 23.1, a plaintiff must allege particularized facts supporting a reasonable inference that either "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* That framing has led to oversight claims being called either a prong-one *Caremark* claim or a prong-two *Caremark* claim.

21

A plaintiff typically pleads a prong-one *Caremark* claim by alleging that the board lacked the requisite information systems and controls. Using more functional terminology, that species of claim can be called an "Information-Systems Claim" or an "Information-Systems Theory." A plaintiff typically pleads a prong-two *Caremark* claim by alleging that the board's information systems generated red flags indicating wrongdoing and that the directors failed to respond. From a functional perspective, the second type of claim can be called a "Red-Flags Claim" or a "Red-Flags Theory." *Cf. City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at \*17 (Del. Ch. June 30, 2022). This decision uses the functional labels or comparable variants. Technically, only the Information-Systems Claim derives from *Caremark*. The Red-Flags Claim traces its lineage to *Allis-Chalmers*.

The *Stone* decision only recognized oversight duties for directors. Neither the Delaware Supreme Court nor this court has expressly held that officers also owe oversight duties.

The case for recognizing that officers owe oversight duties starts with the reasoning of the *Caremark* decision itself. One of the reasons Chancellor Allen provided for recognizing the board's duty of oversight was "the seriousness with which the corporation law views the role of the corporate board." *Caremark*, 698 A.2d at 970. That same seriousness extends to the role of officers. Although Section 141(a) of the Delaware General Corporation Law (the "DGCL") provides that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors," 8 *Del. C.* § 141(a), "it is the rare corporation that is actually 'managed by' the board; most corporations are managed 'under the direction of' the board." J. Travis Laster & John Mark

22

Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36 (2015). "In the typical corporation, it is the officers who are charged with, and responsible for, running the business of the corporation." Megan W. Shaner, *The (Un)Enforcement of Corporate Officers' Duties*, 48 U.C. Davis L. Rev. 271, 285 (2014). "In fact, without officers, there would be no one to make important day-to-day operational decisions or to supervise the lower-level employees who keep a firm running." Nadelle Grossman, *The Duty to Think Strategically*, 73 La. L. Rev. 449, 488 (2013) [hereinafter *Think Strategically*].

Because of this reality, "[m]onitoring and strategy are not exclusively the dominion of the board. Actually, nondirector officers may have a greater capacity to make oversight and strategic decisions on a day-to-day basis." Omari Scott Simmons, *The Corporate Immune System: Governance from the Inside Out*, 2013 U. Ill. L. Rev. 1131, 1160–61 (2013). Indeed, from that perspective, the *Caremark* oversight role "is more suited to corporate officers who are responsible for managing the day-to-day affairs of the corporate enterprise." Dominick T. Gattuso & Vernon R. Proctor, *Reining in Directors and Officers in Corporate America in Delaware, the Answer Is Not to Expand Their Personal Liability*, Bus. L. Today, January/February 2010, at 46, 49. Chancellor Allen's first reason for recognizing oversight duties for directors—the seriousness with which the law takes the role—thus applies equally to officers.

A second reason that Chancellor Allen provided for recognizing the board's duty of oversight was the "fact that relevant and timely information is an essential predicate for satisfaction of the board's supervisory and monitoring role under Section 141." *Caremark*,

23

698 A.2d at 970. The board's need for information leads ineluctably to an imperative for officers to generate and provide that information:

> Whereas a corporate board meets periodically—roughly six to ten times a year—senior officer engagement with the corporation is continuous. From a practical perspective, a board's ability to effectively monitor is contingent upon adequate information flow, usually from senior officers functioning in a nondirectorial capacity.

Simmons, *supra*, at 1160. For relevant and timely information to reach the board, the officers who serve as the day-to-day managers of the entity must make a good faith effort to ensure that information systems are in place so that the officers receive relevant and timely information that they can provide to the directors. *Think Strategically*, *supra*, at 488. It follows that officers must have a duty to make a good faith effort to establish an information system as a predicate to fulfilling their obligation to provide information to the board. *Id.* at 488–89.

A related point is that officers must make decisions in their own right. The *Caremark* decision recognizes this dimension of officer duties when framing the Information-Systems Claim: Corporate fiduciaries can face liability if they knowingly fail to adopt an internal information and reporting system that is "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." 698 A.2d at 970. As this passage shows, Chancellor Allen recognized that both senior management and the board need actionable information, because both management and the

24

board need to be able to make decisions. The fact that officers require information to do their jobs provides further support for officers having oversight obligations.

A third reason that Chancellor Allen provided for recognizing the board's duty of oversight was the importance of having compliance systems in place so the corporation could receive credit under the federal Organizational Sentencing Guidelines. *Id.* at 970. That consideration does not stop at the board level either. The Guidelines state that "[h]igh-level personnel of the organization shall ensure that the organization has an effective compliance and ethics program, as described in this guideline. Specific individual(s) within high-level personnel shall be assigned overall responsibility for the compliance and ethics program."[5] The Guidelines define an organization's "high-level personnel" as "individuals who have substantial control over the organization or who have a substantial role in the making of policy within the organization," which includes "a director; *an executive officer*; an individual in charge of a major business or functional unit of the organization, such as sales, administration, or finance; and an individual with a substantial ownership interest." *Id.* § 8A1.2 cmt. 3(B) (emphasis added).

The Guidelines thus explicitly call for executive officers to undertake compliance and oversight obligations. They also call for high-level personnel to ensure that

> [s]pecific individual(s) within the organization shall be delegated day-to-day operational responsibility for the compliance and ethics program. Individual(s) with operational responsibility shall report periodically to high-

---

[5] U.S. Sent'g Guidelines Manual § 8B2.1(b)(2)(B) (U.S. Sent'g Comm'n 2021), *available at* https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-8.

level personnel and, as appropriate, to the governing authority, or an appropriate subgroup of the governing authority, on the effectiveness of the compliance and ethics program. To carry out such operational responsibility, such individual(s) shall be given adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority.

*Id.* § 8B2.1(b)(2)(C). The steps necessary to meet the expectations of the Guidelines thus extend beyond the board. The importance of officer-level involvement is so apparent that the Organizational Sentencing Guidelines are credited with helping to create a new C-level position: the Chief Compliance Officer.[6] It would seem hard to argue that, simply by virtue of being an officer, the Chief Compliance Officer could not owe a duty of oversight. That, however, is the logical implication of Fairhurst's position that only directors can owe a duty of oversight.

The *Caremark* decision was primarily about the dimension of the oversight duty that supports the Information-Systems Claim. The three foundational premises for recognizing the duty supporting such a claim easily encompass officers. It follows that this dimension of the oversight duty applies to officers.

The dimension of the oversight duty that supports the Red-Flags Claim also applies to officers. That underlying obligation flows from *Allis-Chalmers*. In *Caremark*, Chancellor Allen reframed the earlier decision as having not rejected the obligation to

---

[6] Kathleen C. Grilli et al., U.S. Sent'g Comm'n, *The Organizational Sentencing Guidelines: Thirty Years of Innovation and Influence* 42, 46 (2022), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220829_Organizational-Guidelines.pdf.

26

establish information and reporting systems. Instead, he explained that *Allis-Chalmers* "can be more narrowly interpreted as standing for the proposition that, absent grounds to suspect deception, neither corporate boards *nor senior officers* can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealing on the company's behalf." *Caremark*, 188 A.3d at 969 (emphasis added). Chancellor Allen thus proceeded from the premise that senior officers could be liable on a Red-Flags Claim under the *Allis-Chalmers* rationale if they knew about information that foreclosed reasonable reliance on the integrity of the company's employees.

Just as it makes sense for the Information-Systems Obligation to extend to officers, it also makes sense for the Red-Flags Obligation to extend to officers. As the day-to-day managers of the entity, the officers are optimally positioned to identify red flags and either address them or report upward to more senior officers or to the board. The officers are far more able to spot problems than part-time directors who meet a handful of times a year. The Red-Flags Obligation simply recognizes that the officers who are running the business on a full-time basis have a duty to address or report upward regarding what they see.

### 2. Officers Owe The Same Duties As Directors.

The Delaware Supreme Court's decision to equate the fiduciary obligations of officers with those of directors provides a second reason why officers owe oversight duties. In *Gantler v. Stephens*, the Delaware Supreme Court held that "the fiduciary duties of officers are the same as those of directors." 965 A.2d 695, 709 (Del. 2009). Everyone agrees that directors owe a fiduciary duty of oversight that includes both the Information-Systems Obligation and the Red-Flags Obligation. If officers owe the same duties as

27

directors, then as to matters within their areas of responsibility, officers owe a duty of oversight. Declining to recognize that officers owe a fiduciary duty of oversight would mean, *contra Gantler*, that the fiduciary duties of officers were not the same as those of directors.

Admittedly, neither the Delaware Supreme Court nor this court has said explicitly that officers owe oversight duties. Scholars, however, have reasoned that by equating officer duties with director duties, *Gantler* established that officers owe oversight duties.[7]

Federal bankruptcy courts have reasoned similarly. In a decision that preceded *Gantler* by one year, the United States Bankruptcy Court for the District of Delaware held

---

[7] William R. Heaston, *Copycat Compliance and the Ironies of "Best Practice"*, 24 U. Pa. J. Bus. L. 750, 762 n.56 (2022) (asserting that *Caremark* obligations "apply with equal force to senior corporate executives" (citing *Gantler*)); Richard W. Blackburn & Jeffrey J. Binder, 3 *Successful Partnering Between Inside and Outside Counsel* § 47:6 (April 2021 Update) ("The *Caremark* principles apply not only to directors, but also to a corporation's officers." (citing *Gantler*)); Paul E. McGreal, *Caremark in the Arc of Compliance History*, 90 Temp. L. Rev. 647, 678 (2018) ("In its 2009 decision in *Gantler v. Stephens*, the Delaware Supreme Court held that corporate officers owe the same fiduciary duties as directors, which includes the *Caremark* duty of oversight." (footnotes omitted)); Paul E. McGreal, *Corporate Compliance Survey*, 73 Bus. L. 817, 835 (2018) ("In *Gantler v. Stephens*, the Delaware Supreme Court held that 'the fiduciary duties of officers are the same as those of directors.' As these duties include the 'fiduciary duties of care and loyalty,' and the *Caremark* duty of oversight is part of the duty of loyalty, *Gantler* meant that corporate officers owe the *Caremark* duty of oversight." (footnotes omitted)); Michael R. Siebecker & Andrew M. Brandes, *Corporate Compliance and Criminality: Does the Common Law Promote Culpable Blindness?*, 50 Conn. L. Rev. 387, 441 n.49 (2018) ("[T]he Delaware Supreme Court held in 2009 that the *Caremark* standards of oversight apply not only to directors, but also to officers." (citing *Gantler*)); Nadelle Grossman, *Turning A Short-Term Fling into A Long-Term Commitment: Board Duties in A New Era*, 43 U. Mich. J.L. Reform 905, 970 (2010) (asserting that officers owe duties of oversight and citing *Gantler*).

28

that the Chapter 7 bankruptcy trustee had stated an Information-Systems Claim under *Caremark* against Brian T. Licastro, who had served as the vice president of operations and in-house general counsel for the debtors. *In re World Health Alts., Inc.*, 385 B.R. 576, 571 (Bankr. D. Del. Apr. 9, 2008). The trustee alleged that the debtors' directors and officers misrepresented the debtors' performance in their publicly filed financial reports and in tax filings. *Id.* at 583. The trustee alleged that as general counsel, Licastro owed a duty to implement and monitor an information system capable of flagging material misrepresentations. *Id.* at 591. Because the debtors were Florida corporations, the law of that jurisdiction applied, but in the absence of applicable authority, the court looked to Delaware law for guidance. *Id.* at 590. Licastro contended that the duty of oversight only applied to directors, not officers. *Id.* Citing decisions from this court that anticipated *Gantler* by equating officer duties with director duties, the court reasoned that officers also owed a duty of oversight and that the trustee had pled a viable Information-Systems Claim against Licastro.[8]

In reaching that conclusion, the *World Health* court relied on an earlier decision in which the United States Court of Appeals for the Third Circuit held that a Chapter 7 trustee stated a Red-Flags Claim against two officers of a Delaware corporation. *In re Tower Air, Inc.* 416 F.3d 229, 234 (3d Cir. 2005). The trustee alleged that "Tower Air's officers did

---

[8] *Id.* at 592. To be clear, the *World Health* court did not use the term "Information-Systems Claim." That is my characterization of the type of oversight claim that the decision allowed to proceed.

nothing when they were told by the corporate Director of Safety of quality assurance problems with aircraft maintenance and of failures to record maintenance and repair work." *Id.* at 239. The court of appeals rejected the officers' contention that those allegations failed to state a viable claim: "Under no circumstances should aircraft maintenance problems be ignored. Lives are on the line. . . . The officers' alleged passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Id.* In a footnote, the court acknowledged that it was "less sure" about whether the "alleged failure to report maintenance problems to the directors, or their alleged failure to advise the directors concerning the long-term financial ramifications of the failure to maintain the engines, constitutes irrationality or inattention," but held that it did not need to reach that issue. *Id.* at 239 n.14. The *Tower Air* court thus allowed a Red-Flags Claim to go forward against the officers and, as a result of that holding, allowed an Information-Systems Claim to survive pleading-stage review.[9]

Finally, the United States Bankruptcy Court for the Central District of California touched on oversight issues in *In re AWTR Liquidation Inc.*, 548 B.R. 300 (Bankr. C.D. Cal. Mar. 11, 2016). A Chapter 7 trustee asserted claims for breach of fiduciary against the debtor's directors and officers. *Id.* at 305. The debtor was a California corporation, but in the absence of applicable authority, the court looked to Delaware law for guidance. *Id.* at 311. The court cited *Gantler* as holding that directors and officers have the same duties. *Id.*

---

[9] As with the *World Health* decision, the *Tower Air* decision did not use these terms. They represent my characterization of the oversight claims at issue in the case.

30

at 313. The court then discussed the duty of oversight for purposes of the claims against all of the defendants, noting that the fiduciaries had a duty to establish an information system, but that if they had made an attempt to implement one, then the business judgment rule called for substantial deference to their decisions. *Id.* at 316–18 The court then held that the complaint pled facts supporting an inference that the presumptions of the business judgment rule were rebutted, thereby permitting an Information-Systems Claim to proceed. *Id.* at 318. The only time that the court distinguished between director and officer duties was in rejecting the plaintiffs' argument that the business judgment rule did not protect officers under California law. *Id.* at 320. While acknowledging that California authorities stood for that proposition, the court held that the plaintiffs could not rely on the officer exception because their complaint did "not sufficiently distinguish between their alleged acts and omissions as *officers*, as distinguished from their capacity as *directors*." *Id.* at 320. The *AWTR* decision thus equated director duties with officer duties, incorporated *Caremark* obligations into the officers' duties, and permitted an Information-Systems Claim to proceed.

All of the foregoing authorities hold that officers owe the same duties as directors. Because directors owe a duty of oversight, these authorities indicate that officers owe a duty of oversight.

### 3. The Officer's Duty As Agent

A third source of authority for oversight obligations is the additional duties that officers owe as agents who report to the board. *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020) ("Officers

31

also are fiduciaries in their capacities as agents who report to the board of directors."), *aff'd*, 243 A.3d 417 (Del. 2020). Agents are fiduciaries.[10] As agents, officers "owe additional and more concrete duties to their principal." *Harron*, 275 A.3d 843–44; *see* Restatement of Agency, *supra*, §§ 8.02–.12.

The agent's specific duties include an obligation to provide information to the principal:

> An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when
>
> (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and

---

[10] *Restatement (Third) of Agency* § 1.01 (Am. L. Inst. 2006), Westlaw (database updated Jan. 2023) [hereinafter Restatement of Agency] (defining agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); *id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship"); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 528 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents"). There are Delaware cases which assert errantly that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. For a discussion of those decisions, see *Metro Storage International LLC v. Harron*, 275 A.3d 810, 843 n.14 (Del. Ch. 2022).

(2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person.

Restatement of Agency, *supra*, § 8.11. "The agent's duty is satisfied if the agent uses reasonable effort to provide the information, acting reasonably and consistently with any directions furnished by the principal." *Id.* cmt. b. Notably, the duty extends beyond what the agent actually knows to encompass what the agent has reason to know or should know.

Writing while a member of this court, Chief Justice Strine followed the Restatement of Agency and held that officers have a duty to disclose to a superior officer or the board "material information relevant to the affairs of the agency entrusted to them." *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *13 (Del. Ch. July 12, 2010). Then-Vice Chancellor Strine explained that for purposes of liability, a failure to share information must have been "the product of gross negligence or disloyalty." *Id.* In other words, he recognized a standard of conduct at the officer level that included a duty to act carefully, loyally, and in good faith to gather and provide information, with the standard of liability for the care dimension of the duty measured by gross negligence. By recognizing the duty to provide information, *Hampshire* lays the foundation for an officer-level duty consistent with an Information-Systems Claim.

The agent-based duties of officers also provide the foundation for a Red-Flags Claim. As agents, officers "owe a duty to disclose relevant information if they have notice of facts which they should know may affect the decisions of their principals as to their conduct." *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *14 (Del. Ch. May 18, 2009), *aff'd*, 2010 WL 376924 (Del. Jan. 14, 2010) (ORDER). By

33

definition, a red flag constitutes information that is material to the officer's duties or which a senior officer or the board would wish to have.

The fact that officers are agents provides additional support for recognizing that officers have an oversight duty.

### 4. Officer Accountability To The Board

The foregoing authorities all indicate that officers owe oversight duties. A contrary holding would create a gap in the ability of directors to hold officers accountable. Reasonable minds can disagree about whether, as a matter of policy, stockholders should be able to sue to hold an officer accountable for a failure to exercise oversight. But wherever one might stand on that issue, it is hard to argue that a board of directors should not be able to hold an officer accountable for a failure of oversight.

As the preceding discussion shows, an indispensable part of an officer's job is to gather information and provide timely reports to the board about the officer's area of responsibility. Pause for a moment and envision an officer telling a board that the officer did not have any obligation to gather information and provide timely reports to the board. The directors would quickly disabuse the officer of that notion, and an officer who did not get with the program would not hold that position for long.

Another critical part of an officer's job is to identify red flags, report upward, and address them if they fall within the officer's area of responsibility. Once again, pause and envision an officer telling the board that their job did not include any obligation to report on red flags or to address them. A similar learning opportunity would result.

In the unrealistic hypothetical where an officer declares those contrarian beliefs upfront, the directors are in a position to disabuse the officer of his misconceptions or terminate the officer's role. But directors may only learn about an officer's failure to establish information systems or to identify and report red flags after a corporate trauma has occurred. It is unfathomable that a board would sign off on an officer's expressed intent to put his head in the sand, not make any effort to gather information or report to the board, and not make any effort to address red flags. It is similarly unfathomable that a board could not take action if an officer failed to fulfill those obligations. Yes, a board might determine that disciplining or terminating the officer was sufficient and that a lawsuit was not necessary. But in a case where the officer's failure to exercise oversight had caused the corporation harm, a board could decide to assert a claim for breach of fiduciary duty against an officer. The board should be able to do so.

As this discussion shows, a holding that officers did not owe oversight obligations would not be limited to derivative claims by stockholders. It would apply equally to a board's ability to hold officers accountable. Denying a board of directors the ability to hold officers accountable for oversight failures would undermine the board's statutory authority under Section 141(a).

A holding that officers did not owe oversight obligations also would extend to other actors who can pursue the corporation's claims. To date, questions about an officer's duty of oversight have arisen in bankruptcy litigation, and that makes some sense. Bankruptcy can be viewed as the ultimate corporate trauma, and a bankruptcy trustee seeking to recover on behalf of the estate has an incentive to identify the culpable actors and the ability to

35

assert the corporation's claims against them without having to plead demand futility or show wrongful refusal. The bankruptcy trustee also can act free of past ties to the officer and without concern that a lawsuit might generate discovery that would support a claim against the directors themselves. When a firm fails because officers have failed to establish proper information systems or ignored red flags, a bankruptcy trustee should be able to pursue the culpable parties. Failing to recognize a duty of oversight for officers would prevent a bankruptcy trustee from pursuing those causes of action on behalf of the estate and its beneficiaries.

The oversight duties of officers are an essential link in the corporate oversight structure. The bulwark against the stockholders liberally asserting oversight claims against officers is not the invalidity of the legal theory. Rather, it is the fact that oversight claims are derivative, so the board controls the claim unless a stockholder can plead demand futility or show wrongful refusal. It is those doctrines, applied at the pleading stage under Rule 23.1, that minimize the risk of oversight claims against officers, not the absence of any duty of oversight.

The role of the board in providing oversight for officers also illustrates how a case could result in different outcomes as to different actors. While it seems likely that if a court found a board liable for breach of an oversight obligation, then the officers with responsibility for that area also would be liable, the converse is not true. A board could direct an officer to establish an information system to cover their area, or a board could reasonably believe that an officer had established one. If the officer failed to fulfill those responsibilities, and the board did not consciously act in bad faith by not following up, then

the directors would be in a position to hold the officer accountable without facing oversight liability themselves. The ability of directors to rely on reports from an officer is also pertinent. *See* 8 *Del. C.* § 141(e). If an officer was not providing adequate oversight, but the directors did not have reason to know that, then the board could have relied on the officer in good faith. Again, the directors would be in a position to hold the officer accountable without facing oversight liability themselves.

The officers' role in the corporate oversight structure provides additional support for holding that officers owe oversight duties. Failing to confirm that officers owe oversight duties would undermine the directors' ability to fulfill their statutory obligation to direct and oversee the business and affairs of the corporation.

### 5. The Absence Of Delaware Precedent

In response to the plaintiffs' assertion that an officer-level duty of oversight exists, the defendants argue that officers cannot owe a duty of oversight because *Stone* only embraced the *Caremark* standard for directors and, to date, Delaware cases have only applied the duty of oversight to directors. That observation is descriptively accurate, but it does not follow that officers do not owe oversight duties. For centuries dating back to the Roman satirist Juvenal, Europeans used the phrase "black swan" as a figure of speech for something that did not exist. Then in the late eighteen century, Europeans arrived on the shores of Australia, where they found black swans. The fact that no one had seen one before did not mean that they could not or did not exist. *See* Nicholas Nassim Taleb, *The Black Swan: The Impact of the Highly Improbable* xvii (2d. ed. 2010). Stated less esoterically, the existence of confirmatory evidence for one proposition need not disconfirm another

proposition. *Id.* at 53. Framed in terms of the issue in this case, decisions recognizing director oversight duties confirm that directors owe those duties; those decisions do not rule out the possibility that officers also owe oversight duties.

As this decision has explained, officers' oversight duties flow from multiple sources, including the reasoning of the original *Caremark* decision, the equating of officer duties with director duties in *Gantler*, agency principles, and the accountability structure that exists between officers and the board of directors. The absence of an earlier decision holding that officers owe oversight duties likely has a more practical explanation. Before January 1, 2004, Delaware's jurisdiction-by-consent statute did not extend to officers. *See* Del. S.B. 126, 149th Gen. Assem., 81 Del. Laws ch. 83 (2003). After that date, stockholder plaintiffs moved slowly to name officers as defendants. Only recently has naming officers as defendants become more frequent, prompting the General Assembly to authorize exculpation for officers for stockholder claims, albeit not for claims by or in the name of the corporation, effective August 1, 2022. Del. S.B. 273, 151st Gen. Assem., 83 Del. Laws ch. 377 (2022).

Although there is no Delaware precedent directly on point, both sides try to invoke this court's decision in *AIG*. There, Chief Justice Strine held while serving as a member of this court that stockholder plaintiffs had stated a derivative claim for breach of fiduciary duty against AIG's CEO (Greenberg) and two senior officers (Matthews and Tizzio). *In re Am. Int'l Gp., Inc. Consol. Deriv. Litig. (AIG)*, 965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE). The plaintiffs maintain that the case shows that an oversight claim can proceed

38

against an officer. Observing that all three defendants also served on AIG's board, the defendants argue that the opinion only sustained the claim against the defendants in their capacity as directors. Both sides are partially right.

The plaintiffs in *AIG* alleged that Matthews and Tizzio assisted Greenberg in engaging in intentional misconduct to inflate the value of AIG by billions of dollars through a variety of fraudulent financial schemes. The plaintiffs pled detailed facts about the fraudulent financial schemes themselves, but relatively little "about the specific involvement of Matthews (more particularly) and Tizzio (to a lesser degree) in the fraudulent financial schemes." *Id.* at 795. Based on the detailed factual pleading about the schemes and Matthews and Tizzio's longstanding roles as senior officers in charge of areas where the schemes took place, the court drew the inferences that Matthews and Tizzio were both complicit in the schemes and knew "that AIG's internal controls were inadequate and too easily bypassed." *Id.* The court also drew the inference that

> even when Matthews and Tizzio were not directly complicitous in the wrongful schemes, they were aware of the schemes and knowingly failed to stop them. In that regard, I find it inferable that Matthews and Tizzio were aware of misconduct that should have been brought to the attention of AIG's independent directors (including the Audit Committee) but chose to conceal their knowledge, despite having a fiduciary duty to speak.

*Id.* at 799.

This passage indicates that Matthews and Tizzio were (i) aware of the fraudulent schemes in their capacities as officers and (ii) in those capacities, "knowingly failed to stop them." *Id.* The passage also indicates that Matthews and Tizzio acquired knowledge as officers that "should have been brought to the attention of AIG's independent directors

39

(including the Audit Committee)." *Id.* Those statements point to an officer-level duty of oversight, including a duty to share information with the board and to respond to red flags.

To be sure, the court held that the plaintiffs stated oversight claims against Matthews and Tizzio in their capacity as directors. It is therefore not possible to read *AIG* as holding that officers have oversight duties. What the *AIG* case does not do is hold that officers cannot owe oversight duties. Instead, the legal theory sustained in the *AIG* case rests on what are, at a minimum, the core components of officer oversight duties.[11]

### 6. The Scope Of An Officer's Oversight Duty

For the reasons previously discussed, officers owe duties of oversight comparable to those of directors. But that does not mean that the situational application of those duties will be the same. "Although the fiduciary duty of a Delaware director is unremitting, the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the director is taking with regard to either the

---

[11] Neither side cited *Akorn, Inc. v. Fresenius KABI AG*, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018). That decision concerned whether a buyer could terminate a merger agreement because the target corporation had suffered a material adverse effect ("MAE"). One of the MAEs that the buyer proved at trial was a deviation from the target's as-represented condition regarding regulatory compliance that was so great as to constitute an MAE. *Id.* at *81. The target company's CEO, Raj Rai, testified that he was concerned about regulatory compliance, but the court discredited his testimony and concluded "that he does not regard it as a priority." *Id.* at *13. In a footnote, the court noted that "[a]nother plausible and more alarming inference is that Rai consciously disregarded Akorn's quality issues, including its data integrity problems." *Id.* at *13 n.112. The court collected evidence showing that Rai chaired a quality oversight committee and received reports on quality issues, but never read them. *Id.* Although the court did not come out and say it, the implication was that Rai had a duty to oversee the quality and compliance function and breached that duty by consciously disregarding it.

corporation or its shareholders." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). The same is true for officers, who regularly operate in different contexts than directors.

Most notably, directors are charged with plenary authority over the business and affairs of the corporation. *See* 8 *Del. C.* § 141(a). That means that "the buck stops with the Board." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 835 (Del. Ch. 2011). It also means that the board has oversight duties regarding the corporation as a whole.

Although the CEO and Chief Compliance Officer likely will have company-wide oversight portfolios, other officers generally have a more constrained area of authority. With a constrained area of responsibility comes a constrained version of the duty that supports an Information-Systems Claim.[12] For example, the Chief Financial Officer is responsible for financial oversight and for making a good faith effort to establish reasonable information systems to cover that area. The Chief Legal Officer is responsible for legal oversight and for making a good faith effort to establish reasonable information systems to cover that area. The executive officer in charge of sales and marketing is not

---

[12] *See Think Strategically*, *supra*, at 489 ("[A]n officer should only be required to oversee matters falling within her scope of authority."); *see also* Paul E. McGreal, *Corporate Compliance Survey*, 71 Bus. Law. 227, 242 (2016) ("[T]he officers charged with day-to-day operations may owe a more precisely defined *Caremark* duty. For example, one could frame breach of the chief compliance and ethics officer's initial *Caremark* duty as an utter failure to take steps to implement any one of the components of a compliance and ethics program—i.e., risk assessment, policies, training, monitoring, auditing, or discipline. Under this view, the board's duty is to get the compliance ball rolling, and the chief compliance and ethics officer's duty is to keep that ball moving in the right direction.").

responsible for the financial or legal reporting systems. And of course, the board can tailor the officers' obligations and responsibilities.

For similar reasons, officers generally only will be responsible for addressing or reporting red flags within their areas of responsibility, although one can imagine possible exceptions. If a red flag is sufficiently prominent, for example, then any officer might have a duty to report upward about it. An officer who receives credible information indicating that the corporation is violating the law cannot turn a blind eye and dismiss the issue as "not in my area."

Another important question is the standard of liability for officers. As with directors, officers only will be liable for violations of the duty of oversight if a plaintiff can prove that they acted in bad faith and hence disloyally.

As scholars have chronicled, Delaware's oversight jurisprudence has evolved from the original *Caremark* decision, where the oversight duty could sound in both loyalty or care, to a strictly loyalty-based regime.[13] The corporation in *Caremark* had an exculpatory provision that eliminated director liability for breaches of the duty of care. After noting that the failure to ensure that a corporation information and reporting system existed could, "under some circumstances . . . render a director liable for losses caused by non-compliance

---

[13] *See, e.g.*, Martin Petrin, *Assessing Delaware's Oversight Jurisprudence: A Policy and Theory Perspective*, 5 Va. L. & Bus. Rev. 433, 441–47 (2011); Eric J. Pan, *A Board's Duty to Monitor*, 54 N.Y.L. Sch. L. Rev. 717, 726–33 (2010); Stephen M. Bainbridge et al., *The Convergence of Good Faith and Oversight*, 55 UCLA L. Rev. 559, 594–604 (2008).

with applicable legal standards," Chancellor Allen observed in a footnote that "questions of waiver of liability under certificate provisions authorized by 8 *Del. C.* § 102(b)(7) may also be faced." *Caremark*, 698 A.2d at 970 & n.27. That comment only makes sense if, in the absence of an exculpatory provision, a breach of the duty of care could support an otherwise actionable claim. Other references in the decision also acknowledged that a breach of the duty of care could lead to a failure of oversight.[14]

In another portion of the opinion, however, Chancellor Allen expressed his view that a pure breach of the duty of care, absent conduct that rose to the level of bad faith, should not support a monetary damages award:

> Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment*, he or she should be deemed to satisfy fully the duty of attention. If the shareholders thought themselves entitled to some other quality of judgment than such a director produces in the good faith exercise of the powers of office, then the shareholders should have elected other directors. [15]

---

[14] *See* Bainbridge, *supra*, at 596–97 (collecting passages). Ironically, the actual language of the *Allis-Chalmers* case, from which the Red-Flags Claim derives, acknowledged the possibility of liability for recklessness or gross negligence, which the court framed as cavalier neglect: "In the last analysis, the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him. This is not the case at bar, however, for as soon as it became evident that there were grounds for suspicion, the Board acted promptly to end it and prevent its recurrence." 188 A.2d at 130.

[15] *Caremark*, 698 A.2d at 968. The passage in question has the flavor of a rejoinder to the Delaware Supreme Court's decision in *Cede & Co. v. Technicolor, Inc.*, 634 A.2d

It is possible to read this passage as indicating that a breach of the duty of care should never support liability, whether as an oversight claim or otherwise.

Writing as a member of this court, Chief Justice Strine took up this aspect of *Caremark* and held that director liability for oversight claims always requires a showing of bad faith. *See Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). In *Stone*, the Delaware Supreme Court adopted the *Guttman* formulation and stated that a breach of the duty of loyalty, such as acting in bad faith, was a "necessary condition to liability." *Stone*, 911 A.2d at 364; *see* Banbridge, *supra*, at 595. After *Stone,* then-Vice Chancellor Strine acknowledged that *Caremark* duties carried overtones of care, but explained that "to hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care." *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007). After becoming the Chief Justice, he authored a Delaware Supreme Court decision that made a similar statement: "If *Caremark* means anything, it is that a corporate board must make a good faith effort to exercise its duty of

345 (Del. 1993). As the trial judge in that case, Chancellor Allen had *assumed* that the directors failed to exercise due care, then relied on *Barns v. Andrews*, 298 F. 614 (S.D.N.Y. 1924), to hold that any assumed breach had not proximately caused any damages. *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *17 (Del. Ch. June 24, 1991) (subsequent history omitted). On appeal, the Delaware Supreme Court reversed, relied on what it described as the Chancellor's "presumed findings" to hold that the directors had breached their duty of care, rejected the Chancellor's reliance on *Barnes*, and imposed on the directors an obligation to prove on remand that the transaction was entirely fair. 634 A.2d at 351. In *Caremark*, Chancellor Allen relied prominently on *Barnes* as supporting "the core element of any corporate law duty of care inquiry: whether there was a good faith effort to be informed and exercise judgment." 698 A.2d at 968.

care. A failure to make that effort constitutes a breach of the duty of loyalty." *Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019).

There is room to debate whether the same loyalty-based framework that governs directors should apply to officers, or whether officers could be held liable for a failure of oversight caused by a breach of the duty of care.[16] To state a care-based claim, a plaintiff would have to plead and later prove that the oversight failure resulted from gross negligence. For purposes of Delaware entity law, a showing of gross negligence requires conduct akin to recklessness.[17]

---

[16] Even where directors are concerned, there is a hint that care continues to play a role. The *Stone-Guttman* formulation of *Caremark* liability as requiring bad faith takes care-based liability out of the equation and renders exculpatory provisions superfluous, yet Delaware decisions frequently refer to the presence of an exculpatory provision as a factor when analyzing a *Caremark* claim. *See, e.g.*, *Firemen's Ret. Sys. of St. Louis v. Sorenson*, 2021 WL 4593777, at *8 (Del. Ch. Oct. 5, 2021) ("Because Marriott's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as permitted under 8 *Del. C.* § 102(b)(7), the plaintiff must plead with particularity facts that support a meritorious claim for breach of the duty of loyalty." (cleaned up)); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) ("The likelihood of directors' liability [for a *Caremark* claim] is significantly lessened where, as here, the corporate charter exculpates the directors from liability to the extent authorized by 8 *Del. C.* § 102(b)(7)."); *In re Citigroup Inc., S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. 2009) ("[T]he protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk.").

[17] By using this standard, Delaware entity law protects fiduciaries by requiring a greater showing for liability than what is required in other areas of civil law, as well as an even greater showing than what is required to obtain a conviction for criminal negligence. In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1999) (quoting

The arguments about the oversight regime that should apply to officers parallel the arguments about whether an officer's duty of care should resemble the director regime and require a showing of gross negligence, or whether it should track the agency regime and require only simple negligence. Scholars engaged in extensive debate on that topic.[18]

---

W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)), *cert. denied*, 499 U.S. 952 (1991). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

For purposes of entity law, Delaware frames gross negligence as requiring a showing of recklessness. "In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) (internal quotation marks omitted). "Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (internal quotation marks omitted). To be grossly negligent in this context, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (cleaned up).

[18] For examples of the debate, see Paul Graf, *A Realistic Approach to Officer Liability*, 66 Bus. Law. 315 (2011); Lawrence A. Hamermesh & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005); Lyman P.Q. Johnson & David Millon, *Recalling Why Corporate*

The arguments in favor of a less protective standard for officers generally start from the observation that, while directors are part-time monitors who may meet a handful of times per year, officers are full-time employees who are deeply involved in corporate decision-making on a daily basis. Compared to directors, officers have greater knowledge about and responsibility for the areas under their control. They also receive significantly higher levels of compensation for doing their jobs. The arguments in favor of a more protective standard for officers generally rely on the same justifications that support the business judgment rule, including the risk of hindsight bias in judicial decision-making, the relative incompetence of judges in assessing business decisions, the disproportionate level of liability that an individual could face from harm to a large enterprise, the bluntness of liability as a tool for shaping behavior, and a concern that the threat of liability will cause good people to decline to serve. *See, e.g.*, Petrin, *supra*, at 460–73. Chancellor Allen highlighted some of those arguments in *Caremark*, when he observed that "a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors." 698 A.2d at 971.

---

*Officers Are Fiduciaries*, 46 Wm. & Mary L. Rev. 1597 (2005); Lyman Johnson & Robert Ricca, *Reality Check on Officer Liability*, 67 Bus. Law. 75 (2011); A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 Bus. Law. 215 (1992).

When faced with this type of policy decision, Delaware courts generally view the latter set of considerations as more persuasive and opt for a more protective standard. For example, a comparatively recent series of decisions have adopted the director model for analyzing officers' duty of care.[19] Similar policy rationales about protecting directors and officers against unjustified lawsuits, and the importance of encouraging capable people to serve, drive Delaware's broad construction of advancement and indemnification rights.[20]

---

[19] *See Harron*, 275 A.3d at 846 ("[The officer] also owed a duty of care, albeit a duty framed by the gross negligence standard and attendant corporate law concepts, rather than the simple negligence standard and attendant agency concepts."); *Harcum v. Lovoi*, 2022 WL 29695, at *27 (Del. Ch. Jan. 3, 2022) ("As discussed above, the Complaint does not state a claim that the Proxy contained material omissions or inaccurate disclosures. Even if any of the alleged omissions or inaccurate disclosures were material, I am not persuaded that they were the product of gross negligence on the part of [individual defendants] in their capacities as officers of the Company."); *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *1 (Del. Ch. Aug. 16, 2021) ("Even if *Revlon* did apply, the Complaint fails to well plead non-exculpated claims against each director. As to the claims against [the defendant] in her capacity as an officer, the Complaint fails to well plead either that she was conflicted, implicating her duty of loyalty, or that she acted with gross negligence at any time during the negotiation process, implicating her duty of care."); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) ("An officer's compliance with the duty of care is evaluated for gross negligence."); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) ("Under Delaware law, the standard of care applicable to the fiduciary duty of care of an officer is gross negligence."); *Buckley Fam. Tr. v. McCleary*, 2020 WL 1522549, at *10 (Del. Ch. Mar. 31, 2020) ("Under Delaware law, the standard of care applicable to the fiduciary duty of care of a director or officer is gross negligence." (citing *Gantler*'s equating of officer duties with director duties)).

[20] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) (explaining that indemnification operates "to encourage capable [individuals] to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve"); *accord Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) ("Advancement is an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service."); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998)

A recent event with potential implications for officers' oversight duties is the statutory amendment authorizing limited exculpation for officers. Historically, officers have not been entitled to exculpation, rendering them subject to liability for the duty of care. *See Gantler*, 965 A.2d at 709 n.37. Effective August 1, 2022, the General Assembly amended Section 102(b)(7) of the DGCL to authorize corporations to exculpate officers for care-based liability for direct claims by stockholders. Del. S.B. 273, 151st Gen. Assem., 83 Del. Laws ch. 377 (2022). The amendment did not authorize exculpation for "any action by or in the right of the corporation." *Id.*

The bifurcated approach taken by the amendment might imply a legislative intent to preserve care-based liability for officers for derivative claims, including for breaches of the duty of oversight. But that is not the only inference. Claims for breaches of fiduciary duty generally focus on actions or decisions that a fiduciary has taken affirmatively. Although Delaware authorities regularly equate action and conscious inaction,[21] humans

_____

(explaining that advancement rights "encourag[e] capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity"); Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 98 (Little, Brown & Co. ed., 1972) ("The invariant policy of Delaware legislation on indemnification is to promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation that they have served if they are vindicated." (quotation marks omitted)).

[21] *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (subsequent history omitted) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes,

intuitively distinguish between the two and associate greater culpability with an affirmative act rather than a conscious decision not to act.[22] The amendment to Section 102(b)(7) can be read as preserving care-based liability for officers when they act in a grossly negligent (*i.e.*, reckless) manner. It need not be read to suggest an intent to override the loyalty-based premise of oversight liability for officers and preserve care-based liability in that area.

---

and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. A conscious decision not to take action is just as much of a decision as a decision to act."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean-Paul Sartre, *Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

[22] *See, e.g.*, David Gray, *"You Know You've Gotta Help Me Out . . ."*, 126 Penn. St. L. Rev. 337, 351–65 (2022) (identifying and rejecting reasons for distinction between acts and omissions); George C. Christie, *The Defense of Necessity Considered from the Legal and Moral Points of View*, 48 Duke L.J. 975, 1013 (1999) (applying intuition to the Trolley Problem and analogizing to common law distinction between misfeasance and nonfeasance). This intuition may stem from lived experience in which inaction is less likely to be intentional. *Cf.* Richard S. Kay, *Causing Death for Compassionate Reasons in American Law*, 54 Am. J. Comp. L. 693, 712 (2006) (explaining that the persistence of a distinction between action and inaction "may reflect some idea that inaction often can be explained by inadvertence or mistake, while positive actions are, more generally, intentional" and that when the categories each involve intentional decisions, "the differential legal treatment of misfeasance and nonfeasance seems contrived").

This decision concludes that oversight liability for officers requires a showing of bad faith. The officer must consciously fail to make a good faith effort to establish information systems, or the officer must consciously ignore red flags.

**B.       The Plaintiffs' Allegations Against Fairhurst Support An Oversight Claim.**

The plaintiffs claim that Fairhurst breached his "duty of care by exercising inadequate oversight over enterprise risk management, and with regard to sexual harassment happening at the Company's franchises." Compl. ¶ 182. The plaintiffs thus frame their oversight claim explicitly as a breach of the duty of care. As this decision has explained, officers owe a duty of oversight, but liability requires pleading and later proving bad faith. The allegation that Fairhurst's conduct breached the duty of care is insufficient.

It is tempting to stop there, but "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'—*i.e.*, the requirement that a plaintiff must plead a particular legal theory." *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021). Under the theory of the pleadings, which was a feature of pleading at common law and of code pleading in some jurisdictions, a complaint had to "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." *Mescall v. Tully*, 91 Ind. 96, 99 (1883). If the facts did not support the theory that the plaintiff had picked, then the court would not grant relief, even if the facts established an entitlement to relief under a different theory. *See* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961).

51

The Federal Rules of Civil Procedure "effectively abolished the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." 5 Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated Aug. 2022) [hereinafter Wright & Miller] (footnote omitted). Under the Federal Rules of Civil Procedure, "particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not." *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.). "[T]he federal rules—and the decisions construing them—evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 Wright & Miller, *supra*, § 1219 (footnote omitted). *See generally Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure rejected the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

Delaware adopted the federal rules and embraced their approach to pleading. *See* Hon. Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) ("In 1948, the Courts of Delaware shook off the shackles of mediaeval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules of Civil Procedure." (internal quotation marks omitted)). Court of Chancery Rule 8,

52

which governs pleading, is based on the federal model, and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice."

The real question, therefore, is whether the complaint contained a short, plain statement of facts sufficient to support a claim against Fairhurst for breach of the duty of oversight. *See* Ct. Ch. R. 8(a); *Central Mortg. Co.*, 27 A.3d at 535. Not fixating on the plaintiffs' use of the word "care" is particularly appropriate in this case, because before this decision, no Delaware court had held that a plaintiff must assert that an officer acted in bad faith or disloyally to support an oversight claim. As discussed in the prior section, there are non-frivolous arguments for care-based liability for officers where the duty of oversight is concerned.

The plaintiffs' oversight claim asserts that a culture of sexual misconduct and sexual harassment was allowed to develop at the Company. From a theoretical standpoint, nothing prevents a stockholder from asserting a derivative claim for breach of the duty of oversight based on that theory. *See* Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 Colum. L. Rev. 1583, 1641, 1643–46 (2018). "[C]orporate fiduciaries who fail to monitor harassment at their firms may be liable in certain circumstances under a *Caremark* theory." *Id.* at 1641. And "corporate fiduciaries who are aware of harassment but fail to react—or who affirmatively enable harassment to continue—may be sued for breach of the duties of care and loyalty." *Id.*

In this case, the plaintiffs describe their oversight claim as resting on Fairhurst knowing about evidence of sexual misconduct and acting in bad faith by consciously disregarding his duty to address the misconduct. In other words, the plaintiffs have asserted

53

a Red-Flags Claim. They have not asserted an Information-Systems Claim. They also have not asserted that Fairhurst consciously caused the Company to violate laws that protect against sexual harassment, such as Title VII of the Civil Rights Act of 1964 or state-level human rights laws. *See* Hemel & Lund, *supra*, at 1610, 1630. That type of claim—known colloquially as a "*Massey* Claim"—is not technically an oversight claim, but it has a similar feel. *See Lebanon Cnty. Empls.' Ret. Fund v. Collis*, 2022 WL 17841215, at \*18 (Del. Ch. Dec. 22, 2022).

To plead a Red-Flags Claim that will survive a Rule 12(b)(6) motion, a plaintiff must plead facts supporting an inference that the fiduciary knew of evidence of corporate misconduct. The plaintiff also must plead facts supporting an inference that the fiduciary consciously failed to take action in response. The pled facts must support an inference that the failure to take action was sufficiently sustained, systematic, or striking to constitute action in bad faith. A claim that a fiduciary had notice of serious misconduct and simply brushed it off or otherwise failed to investigate states a claim for breach of duty. *AmerisourceBergen*, 2020 WL 132752, at \*20.

### 1. The Existence Of Red Flags

The plaintiffs' Red-Flags Claim asserts that Fairhurst permitted a toxic culture to develop at the Company that turned a blind eye to sexual harassment and misconduct. As the red flags evidencing that growing culture, the plaintiffs cite a series of events, with the following pertinent to the claim against Fairhurst:

- Easterbrook and Fairhurst took over at the Company in 2015.

54

- Easterbrook and Fairhurst promoted a party atmosphere at the Company that emphasized drinking.

- The human resources department ignored complaints about the conduct of co-workers and executives.

- Employees feared retaliation for reporting complaints to the human resources department.

- In October 2016, over a dozen Company employees filed complaints with the EEOC about sexual harassment and misconduct at the Company.

- Later that month, employees in over thirty cities across the United States staged a one-day walkout to protest problems with sexual harassment and misconduct at the Company.

- In December 2016, Fairhurst engaged in an act of sexual harassment that was not reported to the Company's Compliance Department and did not reach the Audit Committee or the Board.

- In May 2018, over a dozen Company employees filed coordinated complaints with the EEOC.

- In September 2018, Company workers from ten cities organized a one-day strike to protest the Company's culture of sexual harassment.

- In November 2018, Fairhurst engaged in an act of sexual harassment at a party for the human resources staff. Over thirty Company employees witnessed the incident, and several reported it to the Company's Compliance Department. The Compliance Department concluded that Fairhurst violated the Company's Standards of Business Conduct.

- In December 2018, the Audit Committee reviewed the incident involving Fairhurst and chose to discipline him and require that he execute the Last Chance Letter.

- Also in December 2018, Senator Duckworth wrote a letter to the Company about sexual harassment complaints against the Company.

- In June 2019, Senator Duckworth joined with seven other United States Senators in writing to the Company and asking specific questions about sexual harassment and workplace safety.

- In October 2019, the Board learned that Easterbrook was engaging in a prohibited relationship with a Company employee.

55

- In November 2019, after investigating Easterbrook's misconduct, the Board terminated Easterbrook without cause.

- Also in November 2019, the Board terminated Fairhurst with cause, inferably because he had violated the terms of his Last Chance Letter and engaged in an additional act of sexual harassment.

- Also in November 2019, workers filed the *Ries* Action against the Company, alleging that it had a toxic culture that accommodates sexual harassment.

- In April 2020, workers filed the *Fairley* Action against the Company, seeking damages for sexual harassment, retaliation, and related misconduct.

Based on these events, the plaintiffs seek an inference that Fairhurst ignored red flags about sexual harassment at the Company, resulting in harm that manifested itself through the lawsuits and attendant reputational harm.

These allegations support Fairhurst's knowledge of red flags. As Global Chief People Officer, he was the executive officer with day-to-day responsibility for overseeing the human resources function and promoting a safe and respectful environment. He was supposed to have his ear to the ground and be knowledgeable about the Company's employees. For someone in Fairhurst's position, the coordinated EEOC complaints in October 2016, followed by a thirty-city walkout, were massive red flags. He should have been figuring out whether something was seriously wrong and either addressing it or reporting upward to the CEO and the directors. For someone in Fairhurst's position, the second round of coordinated EEOC complaints in May 2018, followed by a second one-day strike in ten cities in September 2018, was another set of red flags. He again should have been figuring out whether something was seriously wrong and either addressing it or reporting upward to the CEO and the directors.

The Section 220 documents that the Company produced support the inference that the management team regarded these events as red flags. In January 2019, the Company's General Counsel reported to the Strategy Committee about the EEOC complaints and management's deployment of resources to address sexual harassment and misconduct at the Company. In May, the General Counsel discussed the same issues with the full Board. In June, the Strategy Committee held a special meeting devoted solely to those issues and the Company's response. In September, the Company's enterprise risk management assessment added a "Respectful Workplace" as a "New Risk Theme" at the "Top Tier 2" risk level.

At the pleading stage, it is reasonable to infer that there were problems with sexual harassment and misconduct at the Company. It is also reasonable to infer that Fairhurst knew about them. The alternative inference—that the Company's Global Chief People Officer did not know—is not reasonable. In any event, Fairhurst undoubtedly knew about them by June 2019 because, during that month, he co-authored a memorandum to the Strategy Committee about management's response.

The plaintiffs have pled facts supporting an inference that by October 2016, Fairhurst knew that there were potential problems with sexual harassment and misconduct at the Company. That satisfies the first element of a Red-Flags Claim.

### 2. The Response To The Red Flags

Pleading red flags is not enough. The plaintiffs also must plead facts supporting an inference that Fairhurst acted in bad faith by consciously ignoring red flags. Fiduciaries of a Delaware corporation are presumed to act in good faith. *E.g.*, *In re Walt Disney Co. Deriv.*

57

*Litig.*, 906 A.2d 27, 52 (Del. 2006). A complaint must plead facts supporting a contrary inference.

Several factors support an inference of *scienter*. First, there are the allegations about Fairhurst's own participation in multiple acts of sexual harassment. He committed an act of sexual harassment in December 2016, shortly after the first set of EEOC complaints and the associated thirty-city walkout. He committed another act of sexual harassment in November 2018, after the second round of EEOC complaints and the ten-city strike. He committed a third act of sexual harassment in November 2019, after spending the prior year focusing with the rest of the management team on ways to address the Company's problems with sexual harassment and misconduct. When considering whether a defendant consciously ignored red flags regarding a culture of sexual harassment and misconduct, it is reasonable to give weight to the fact that the defendant himself committed multiple acts of sexual harassment, including repeating the behavior after being disciplined and given a last chance. It is reasonable to infer that such an individual could consciously turn a blind eye to red flags about similar conduct by others.

Second, the complaint alleges that under Fairhurst's watch, the human resources department ignored complaints about the conduct of co-workers and executives. The complaint also alleges that employees feared retaliation for reporting complaints to the human resources department. Those allegations support the inference that as a serial harasser, Fairhurst was consciously failing to do what he should have done to address problems with sexual harassment and misconduct. Instead, he and Easterbrook were promoting and enjoying the party atmosphere at headquarters.

58

Third, there is an absence of evidence from the Section 220 production indicating that Fairhurst took action to report upward to the director level about sexual harassment issues before June 2019. There is a similar absence of evidence from the Section 220 production indicating that the Company was taking meaningful action to address problems with sexual harassment and misconduct until January 2019. It is reasonable to infer that the events of 2018 prompted Company management to begin focusing on the issue and caused the directors to engage. The directors' realization that the Company's Global Chief People Officer had committed two known acts of sexual harassment doubtless contributed to their decision to make the issue a priority for 2019.

To be sure, there is record evidence indicating that during 2019, Fairhurst was part of the effort by Company management to address the problem of sexual harassment and misconduct. Most notably, he co-authored a memorandum for the Strategy Committee's meeting in June 2019 that described what action the Company was taking in response to the red flags about sexual harassment. He also gave presentations to the Strategy Committee in June and September. The actions that Company management took, such as adopting an updated anti-sexual harassment policy and creating new employee training programs, would have involved the human resources department that Fairhurst led.

Beginning in 2019, therefore, it is not possible to draw an inference that Fairhurst consciously ignored the Company's problems with sexual harassment and misconduct. But it is also fair to note that Fairhurst had been disciplined for sexual harassment in November 2018. He was part of the problem, and he was caught, so he had to be part of the solution. Of course, he also engaged in a third act of sexual harassment in November 2019 and was

59

terminated for it. It is reasonable to infer that Fairhurst's acts of sexual harassment constituted knowing misconduct.

Given the pled facts, it is possible that even during 2019, Fairhurst went through the motions of assisting his colleagues while continuing to turn a blind eye to instances of harassment until his termination in November 2019 ended his tenure at the Company. It is also possible that Fairhurst will not face liability for conduct that occurred during 2019 because he participated in the Company's response. At the pleading stage, it is not possible to decide between these inferences or determine the metes and bounds of Fairhurst's potential liability. It is enough to hold that the complaint's allegations support a claim against Fairhurst for breach of the duty of oversight.

## C.     The Plaintiffs' Allegations Against Fairhurst State A Claim For Breach Of The Duty Of Loyalty As To His Own Acts Of Harassment.

The plaintiffs also claim that Fairhurst breached his fiduciary duties by engaging personally in acts of sexual harassment. That theory states a claim on which relief can be granted.

"[F]iduciaries violate the duty of loyalty when they engage in harassment themselves." Hemel & Lund, *supra*, at 1641. Although "[t]he standard of loyalty is measured by no fixed scale," a director's duty of loyalty "requires an undivided and unselfish loyalty to the corporation" and "demands that there shall be no conflict between duty and self-interest." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Id.* When a fiduciary "intentionally acts with a purpose other than that of

60

advancing the best interests of the corporation," the fiduciary acts in bad faith, which constitutes a breach of the duty of loyalty. *Disney*, 906 A.2d at 67. "[A] CEO or other corporate officer who uses a position of power to harass, intimidate, or assault employees clearly acts for a purpose other than that of advancing the company's interests."[23]

The prior section details the specific allegations contained in the complaint about multiple incidents of sexual harassment by Fairhurst. When Fairhurst engaged in sexual harassment, he was not acting subjectively to further the best interests of the Company.[24] He therefore was acting in bad faith. The allegations against Fairhurst accordingly support a claim for breach of the duty of loyalty.

In response to the plaintiffs' assertion that sexual harassment constitutes a breach of the duty of loyalty, Fairhurst argues that the plaintiffs failed to plead facts supporting an inference that he subjectively intended to harm the Company. Dkt. 60 at 20. Yes, for a fiduciary to act with a subjective intent to harm a corporation is one form of bad faith. *Disney*, 906 A.2d at 64. And bad faith also encompasses "intentional dereliction of duty [or] a conscious disregard for one's responsibilities." *Id.* at 66. And a fiduciary acts in bad

---

[23] Hemel & Lund, *supra*, at 1641-42 (citing *Prozinski v. Ne. Real Estate Servs.*, 797 N.E.2d 415, 423–24 (Mass. App. Ct. 2003) (holding that when an officer "allegedly embarked on a course of sexual harassment of [a] receptionist," his "placement of his own interests above those of the company he served could be found by a fact finder to constitute an act of disloyalty")).

[24] *See, e.g.*, Hemel & Lund, *supra*, at 1642 ("The consequences for the firm go well beyond the risk of liability: Sexual harassment in the workplace potentially damages employee morale, drives talented individuals away from the firm, and endangers the company's reputation.").

faith where he possesses a "dishonest purpose or moral obliquity." *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005) (TABLE).

More generally, a fiduciary acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Stone*, 911 A.2d at 369. "It makes no difference the reason why the [fiduciary] intentionally fails to pursue the best interests of the corporation." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *27 (Del. Ch. Apr. 14, 2017) (cleaned up). "Bad faith can be the result of any emotion that may cause a [fiduciary] to intentionally place his own interests, preferences or appetites before the welfare of the corporation." *Id.* (cleaned up). "Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride." *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.).

It is not reasonable to infer that Fairhurst acted in good faith and remained loyal to the Company while committing acts of sexual harassment, violating company policy, violating positive law, and subjecting the Company to liability. It is reasonable to infer that Fairhurst acted disloyally and for an improper purpose, unrelated to the best interests of the Company.

Although this analysis seems straightforward, some might question as a matter of policy whether a claim for breach of fiduciary duty should extend to acts of sexual

harassment.[25] After all, a corporation can terminate the offending employees, and there often will be a claim for breach of an employment agreement. Meanwhile, victims can pursue remedies under federal and state law. Some might ask whether the Court of Chancery should be hearing sexual harassment claims and worry that recognizing such a claim will open the floodgates to employment-style litigation.

A flood of new employment-style claims seems unlikely. Like an oversight claim, a claim for breach of duty based on the officer's own acts of sexual harassment is derivative, so all of the protections associated with derivative claims apply. The claim is not one that a victim has standing to bring against a solvent corporation: Until a victim

---

[25] A New York decision held that a corporation failed to state a claim for breach of the duty of loyalty under New York law against a former executive vice president who was terminated based on sexual harassment complaints from several current and former employees. *Pozner v. Fox Broad. Co.*, 74 N.Y.S.3d 711, 712 (N.Y. Sup. Ct. 2018). The court reasoned that the duty of loyalty "has only been extended to cases where the employee act[s] directly against the employer's interests—as in embezzlement, improperly competing with the current employer or usurping business opportunities." *Id.* at 713-14. Under Delaware law, the duty of loyalty is not so narrow. Regardless, it is reasonable to infer that when a fiduciary engages in sexual harassment, the fiduciary acts directly against the corporation's interest by harming an employee, jeopardizing the corporation's relationship with that employee and other employees, and subjecting the company to potential liability. This court noted the existence of the *Pozner* case when assessing after trial whether a corporation proved a claim against a former director and officer for engaging in a "campaign of harassment" against fellow directors and former employees that involved "inflammatory name-calling," aggressive posturing during meetings, and retaliation against employees that included no longer speaking with an employee and having another employee check her work. *See Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *23-25 n.299 (Del. Ch. Feb. 25, 2019). With little precedent to go on, the *Glaubach* decision identified *Pozner* in passing. *Id.* at *25 n.299. The *Glaubach* decision did not rely on *Pozner* or endorse its reasoning. The *Glaubach* decision did not involve a claim that a fiduciary had breached the duty of loyalty under Delaware law by engaging in sexual harassment.

obtains a judgment against the corporation, the victim is a contingent creditor, and after judgment, an actual creditor.

A claim for breach of fiduciary duty is also not duplicative of other remedies. In many cases, a claim for breach of an employment agreement may be a possible cause of action, but not all fiduciaries have employment agreements. Directors rarely do. If an officer or director personally engages in acts of sexual harassment, and if the entity suffers harm, then either the governing body of the entity (or, if necessary, a plaintiff acting properly on its behalf) should be able to assert a claim for breach of fiduciary duty in an effort to shift the loss that the entity suffered to the human actor who caused it.

Sexual harassment is bad faith conduct. Bad faith conduct is disloyal conduct. Disloyal conduct is actionable. The claim against Fairhurst for his own acts of sexual harassment survives review under Rule 12(b)(6).

## III. CONCLUSION

The plaintiffs have pled a claim against Fairhurst for breach of the duty of oversight. The plaintiffs also have pled a claim against Fairhurst for breach of the duty of loyalty based on the specific acts of sexual harassment in which he engaged. Fairhurst's motion to dismiss under Rule 12(b)(6) is denied.

64